**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Brittany J. S.,

Plaintiff,

v.

Frank Bisignano, Commissioner of Social Security,

Defendant.

Case No. 25-cv-3753 (SRN/SGE)

**ORDER**

---

Michael Todd Freske, P.O. Box 506, Champlin, MN 55316, for Plaintiff

James D. Sides and Emily Carroll, Social Security Administration, 6401 Security Blvd., Baltimore, MD 21235, for Defendant.

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Brittany J.S. seeks judicial review of a final decision by the Defendant Commissioner of Social Security (the "Commissioner") denying her application for disability benefits. The matter is before the Court on Plaintiff's Brief [Doc. No. 10].[1]

Plaintiff seeks reversal of the Commissioner's decision, arguing that the Administrative Law Judge (ALJ) failed to evaluate the medical opinion evidence, resulting in a determination of her residual functional capacity (RFC) that was not based on

[1] As of December 1, 2022, Social Security actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supp. R. Soc. Sec. 5.

substantial evidence. (Pl.'s Br. at 25–34.) In addition, Plaintiff argues that the ALJ failed to properly evaluate her subjective symptom testimony. (*Id.* at 34–38.)

For the reasons set forth below, Plaintiff's request for relief is granted in part and denied in part, and Defendant's request for relief is denied.

## I. Background

### A. Procedural History

Plaintiff, who is currently 36 years old, alleges disability beginning on April 22, 2020. (*See* Soc. Sec. Admin. R. (hereinafter "R.") 17, 52, 3903.)[2] Plaintiff's alleged severe impairments include heart attack/ischemic cardiomyopathy, syncope, chronic migraine, asthma, obesity, right shoulder degenerative joint disease, chronic pain syndrome, depression, anxiety, bipolar disorder, personality disorder, and posttraumatic stress disorder (PTSD). (R. 3906.) Her medical record also includes the following impairments: hypertension, hyperlipidemia, vitamin D deficiency, sleep apnea, history of cerebrovascular accident, anemia secondary to menorrhagia, ovarian cyst, cholecystitis, back pain/SI joint dysfunction, reflux gastritis/gastroesophageal reflux disease, and rectocele/cystocele. (*Id.*)

Plaintiff has not engaged in substantial gainful activity since her alleged disability onset date of April 22, 2020. (*Id.*)

---

[2] The Social Security administrative record is filed at Doc. No. 8 (index & pp. 1–1127), Doc. No. 8-1 (pp. 1128–2410), Doc. No. 8-2 (pp. 2411–3757), Doc. No. 8-3 (pp. 3758–4701), and Doc. No. 8-4 (pp. 4702–4964). The record is consecutively paginated, and the Court cites to that pagination rather than docket number and page.

After Plaintiff's initial disability application was denied, as well as her request for reconsideration, she requested a hearing before an ALJ. (R. 124–26.) ALJ JoErin O'Leary held a hearing on February 2, 2023. (R. 46–75.) On April 5, 2023, the ALJ found that Plaintiff was not disabled, and denied her application for disability benefits. (R. 17–40.) Plaintiff's request for review before the Appeals Council was also denied. (R. 1–6.)

Plaintiff then filed a complaint in this Court, *Brittany J.S. v. O'Malley*, 24-cv-155 (PJS/TNL), seeking further review. Pursuant to a joint stipulation of the parties requesting remand, the Court remanded the matter to the Commissioner for further proceedings. (R. 4006–07.)

On remand, ALJ Joshua Klasic held a hearing on May 1, 2025. (R. 3941–66.) The ALJ issued a decision on June 9, 2025, finding Plaintiff not disabled. (R. 3900–32.)

Plaintiff filed the instant Complaint on September 24, 2025, requesting that the Court reverse the ALJ's decision and order the award of benefits, or in the alternative, remand the matter for further proceedings. (Compl. [Doc. No. 1] ¶ 14; Pl.'s Br. at 38; Reply [Doc. No. 14] at 6.)

In response, Defendant contends that substantial evidence supports the ALJ's decision and therefore requests that the ALJ's finding of no disability be affirmed. (Def.'s Br. [Doc. No. 13] at 1, 13.)

**B. Relevant Medical and Other Evidence**

Plaintiff grew up in the Twin Cities, and later lived in Illinois for seven years. (R. 3875.) In June 2020, Plaintiff moved back to Minnesota. (*Id.*)

She graduated from high school with honors and attended two colleges, but did not complete a degree. (R. 3766.)

**1. Cardiovascular History**

Plaintiff was born with Shone's Syndrome, also called Shone's Complex, a birth defect of the heart. (R. 1254, 1259.) At age 5, a coarctation of the aorta repair was performed, followed by aortic valve replacement in 2009. (R. 1298, 1381, 1407.) Plaintiff has also been diagnosed with ischemic cardiomyopathy with dilation. (R. 53, 1304). She had a stroke at approximately age 19 or in her early 20s. (R. 430, 494, 514, 3765, 3771.)

On April 22, 2020, Plaintiff was working as a hospital emergency room receptionist when she suffered a heart attack, specifically an ST-elevation myocardial infarction (STEMI). (R. 814–16.) Given her cardiac history, she had been prescribed lifelong anticoagulation therapy, but after losing her insurance in 2017, she discontinued her cardiac medications. (*Id.*) While treating her heart attack, emergency department staff discovered a 100% blockage in her Left Anterior Descending (LAD) artery, for which a stent was placed and angioplasty was performed. (R. 53, 629, 1308.) Following her heart attack, Plaintiff was prescribed a LifeVest Wearable Defibrillator. (R. 821, 1320.) The LifeVest was discontinued in July 2020 after Plaintiff's ejection fraction improved. (R. 727, 731.)

Plaintiff has treated with Dr. Jamie Lohr, a cardiologist at the University of Minnesota, every six months. (R. 3950, 4468–.) In 2025, Plaintiff testified that no other cardiologist would accept her as a patient because of her complex cardiac history. (R. 4022–23.) She further testified that her heart consists of "half-dead tissue now." (R. 3950.)

In 2023, Plaintiff testified that she sometimes experiences cardiac pain, for which she was prescribed nitroglycerin. (R. 64.) However, she does not take nitroglycerin often due to her syncope episodes. (*Id.*) At her May 2025 hearing, Plaintiff testified that she takes beta blockers, diuretics, and other medications for her heart conditions. (R. 3951.)

She also noted that she regularly experiences swelling in her hands, arms, legs, and feet. (R. 3954.) While her diuretics provide some relief, the diuretics "don't seem to get everything out." (R. 3954–55.) She testified that swelling in her hands causes stiffness with gripping, writing, typing, and using a computer mouse. (R. 3955.) Plaintiff also testified that throughout the day, she elevates her feet when seated in a recliner to counteract swelling in her legs and feet. (*Id.*)

**2. Syncope History**

After her heart attack, Plaintiff began to experience ongoing syncopal episodes. (R. 419, 444, 529–30, 723.) In May 2025, she testified that her ongoing syncopal episodes occur three to seven times per week. (R. 3949.) The episodes are triggered by coughing, turning her head to the left, or they occur randomly. (R. 55, 1255, 3950.) During these episodes, she experiences dizziness and frequently loses consciousness. (R. 1256, 3950.) Plaintiff reports "waking up a minute later not knowing what's going on." (R. 3950). Her dizziness symptoms can be exacerbated by other movements, including, but not limited to, "bending forward, standing up, rapid head movements, changes in position of the head or body." (R. 1256, 3950.) Plaintiff has consulted a cardiologist, two neurologists and ENT specialists to address her syncopal episodes, but "they just can't figure them out." (R. 1642, 3949.) Plaintiff testified that she sometimes injures herself by falling during a

syncopal episode. (R. 56.) At the February 2023 hearing, Plaintiff stated that she does not use a walker or assistive device to prevent falling for fear of tripping over the equipment. (R. 56–57.)

### 3. Mental Health History

Plaintiff has a childhood history of physical and sexual abuse. (R. 1555, 3766.) Her mental health history includes diagnoses of PTSD, anxiety, depression, bipolar disorder, panic disorder, borderline personality disorder, and general and social anxiety. (R. 585, 1559, 1570, 2415.) Plaintiff's records report a history of 15 hospitalizations for suicide attempts or suicidal ideation, although the most recent occurred in 2015. (R. 1556, 2686, 3112, 3124.) Plaintiff also claims to suffer from agoraphobia and "very minimal" obsessive-compulsive disorder (OCD). (R. 53, 2646, 3751.)

In May 2025, Plaintiff testified that she continues to experience anxiety and is on different mental health medications. (R. 3951–53.) Numerous situations and people trigger her anxiety. (R. 3953.) She has a history of receiving dialectical behavior therapy, and most recently meets with her psychiatrist on a monthly basis. (R. 3766, 3951–52.)

### 4. Additional Medical History

As evidenced by the record, Plaintiff's medical history is complex. (R. 436, 588, 662, 687, 1256, 3790, 3809, 3875). Plaintiff takes 20 different medications to treat her various health impairments. (R. 4456–58). At the May 2025 administrative hearing, when asked to identify her most significant medical issue, Plaintiff testified, "[T]here's a few different things that are major issues for me that all actually add up all on their own." (R. 3949.) She described syncope, fibromyalgia, the inability to sit or stand for long, anxiety,

treatment by neurologists and cardiologists, her numerous medications, and "being able to function throughout the day." (*Id.*) She stated, "It's really everything all put together." (*Id.*)

Plaintiff attributes her right shoulder subluxation, or dislocation, to her stroke. (R. 59.) She testified to having weakness in her arms, and has been advised against bearing any weight with her right shoulder and reaching overhead. (R. 59, 3951.) In addition, Plaintiff stated that while her left shoulder does not dislocate like her right shoulder, it is similarly weak. (R. 59) She described overhead reaching as difficult, but denied any loss of strength in her hands and fingers. (*Id.*) At the May 2025 hearing, Plaintiff testified, "I'm not able to lift anything of weight mainly due to hernias, and then just plain due to weakness." (R. 3955.) She added, "Between weakness and my joints, and weakness in the actual muscles themselves, my joints themselves are very unstable." (*Id.*) She stated that if she lifts an object and her muscles are not perfectly engaged, her joints dislocate. (R. 3956.)

Regarding her physical pain, in May 2025, Plaintiff testified that she meets with a pain specialist every six months and also participates in physical therapy. (R. 3952.)

Plaintiff also noted difficulty climbing stairs and often needs to take a break for approximately one to five minutes. (R. 60.)

As to treatment for her back, Plaintiff testified in 2023 that she attended physical therapy and had received injections for pain, but was unable to take a steroid for her sacroiliac joint because it might interact with the Coumadin that she takes for her heart conditions. (R. 65.)

In 2023, Plaintiff also testified about migraine headaches, stating that she experiences multiple migraines a month. (R. 65–66.) She stated that she takes Topamax, an anti-seizure medication, for her migraines. (R. 66, 3951.) Sometimes, she only experiences an ocular migraine. (R. 65–66.) Plaintiff testified that her migraines last two to three days and she experiences approximately one to three headaches a week. (R. 66, 3953.) In light of her headaches, she testified that it was rare that she felt well enough to go down the stairs and to the store with her boyfriend. (R. 66.)

**5. Activities of Daily Living**

While she has a driver's license, Plaintiff no longer drives because of her syncope episodes. (R. 60–61, 3947.) She lives with her boyfriend, who does the grocery shopping, and they cook together. (R. 61–62.) Plaintiff testified that they do not entertain others because "I don't do people." (R. 61.) Her boyfriend performs most of the household chores, and due to pain in Plaintiff's lower back, he performs any tasks that involve bending over or kneeling. (R. 62.)

Plaintiff testified that since her heart attack in 2020, she has been advised to only take cool showers. (R. 63.) While she can generally shower by herself, her arms start to tingle and go numb when she washes her hair. (*Id.*) Sometimes, she takes a break and other times, her boyfriend showers with her. (*Id.*)

Plaintiff testified that she sleeps between two and ten hours per day, although some of the sleep consists of a daytime nap. (R. 63–64.)

Plaintiff, who is 5'4", described her weight as going "up and down." (R. 64.) She testified that it went down to 230 pounds after she had gall bladder surgery, but she was regaining the weight. (*Id.*)

### C. Expert Testimony

Vocational Expert Judith Findora testified at the May 2025 hearing before the ALJ. (R. 3956–64.)

The ALJ found that Plaintiff had no prior relevant work, then first posed the following hypothetical question to Ms. Findora, asking her to assume it related to an individual of Plaintiff's same age, education, and job experience:

> For hypothetical one, further assume that this individual could perform sedentary work as that term is defined in the regulations. In addition, this individual can occasionally climb ramps and stairs. Never climb ladders, ropes, and scaffolds. Never kneel or crawl. Can occasionally balance, stoop, and crouch.
>
> Can never reach overhead with the dominant right upper extremity. Can frequently reach in all other directions with the dominant right upper extremity. Can have occasional exposure . . . to extreme cold, extreme heat, wetness, humidity, and vibration.
>
> Can never be exposed to unprotected heights and dangerous moving mechanical parts. Can understand, remember, and carry out simple instructions. Cannot perform production rate work, such as assembly line work or work that requires hourly quotas. Can deal with occasional changes in a routine work setting. And finally, can occasionally interact with supervisors, coworkers, and the public.
>
> Under this hypothetical question, in your opinion, would there be work available in the national economy that such a person could perform?

(R. 3957–59.) Ms. Findora testified that such a person could perform work as a sorter, packer, or bench assembler that does not work on a moving assembly line. (R. 3958.)

The ALJ then asked Ms. Findora to consider an additional limitation, requiring the hypothetical person to frequently handle and finger with the bilateral upper extremities. (R. 3958–59.) Ms. Findora testified that such a person could perform the same jobs that she had identified. (R. 3959.)

The ALJ then posed a second hypothetical question, asking Ms. Findora to assume that the hypothetical individual had all of the same limitations as in the first hypothetical, but instead of occasionally interacting with coworkers and supervisors, the individual could engage in routine superficial contact with coworkers and supervisors, such as taking instructions, relaying basic information, and transferring materials. (R. 3959–60.) Ms. Findora responded, "Yes, these are simple, routine jobs. So the individual's working rather independently" and the "job duties themselves do not require any interaction." (*Id.*)

Finally, in his third hypothetical question, the ALJ asked if employment would be precluded if the person were absent from work more than three times per month. (R. 3960.) Ms. Findora answered that there would be no jobs in the national economy for such a person, as an employer would not generally tolerate more than three absences per month from an employee who had established a pattern of absenteeism. (*Id.*) The ALJ also asked about an employer's typical tolerance for an employee being off-task in an eight-hour workday. (R. 3960–61.) Ms. Findora testified that "assuming the individual specifically leav[es] their workstation, I find it becomes preclusive [of employment at] approximately 20 percent [of the workday]." (*Id.*)

### D. ALJ's Decision on Review

In the ALJ's June 9, 2025 decision, he conducted the five-step sequential analysis outlined in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).[3] At Step One, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of April 22, 2020. (R. 3906.) At Step Two, the ALJ concluded that Plaintiff has the following severe impairments:

> heart attack/ischemic cardiomyopathy, syncope, chronic migraine, asthma, obesity, right shoulder degenerative joint disease, chronic pain syndrome, depression, anxiety, bipolar disorder, personality disorder, and posttraumatic stress disorder.

(*Id.*) The ALJ concluded at Step Three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. 3908.)

Before moving to Step Four, the ALJ assessed Plaintiff's RFC. He found that Plaintiff:

> has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; never kneel or crawl; occasionally balance, stoop, and crouch; can never reach overhead with the dominant right upper extremity; frequently reach in all other directions with the dominant right upper extremity;

---

[3] Steps One through Four ask: (1) whether the claimant has engaged in substantial gainful activity since the alleged onset of disability; (2) whether the claimant is suffering from a severe medical impairment; (3) whether claimant's impairment meets or equals the severity of an impairment listed in the Listing of Impairments (20 C.F.R. Part 404, Subpart P, App. 1); and (4) whether the claimant has the Residual Functional Capacity (RFC) to perform their past relevant work (PRW). 20 C.F.R. § 404.1520. If the claimant successfully meets their burden of proof for Steps One through Four, the Commissioner bears the burden at Step Five to establish that the claimant can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1505(a), 404.1512(f), 404.1520(a)(4)(v).

> frequently handle and finger with the bilateral upper extremities; occasional exposure to extreme cold, extreme heat, wetness, humidity, and vibration; never be exposed to unprotected heights and dangerous moving mechanical parts; understand, remember, and carry out simple instructions; cannot perform production rate work such as assembly line work or work that requires hourly quotas; deal with occasional changes in a routine work setting; occasionally interact with public; and can engage in routine and superficial contact with supervisors and coworkers.

(R. 3912.) In determining Plaintiff's RFC, the ALJ stated that he had considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . [including] the medical opinion(s) and prior administrative finding(s) in accordance with the requirements of 20 CFR 404.1520c." (*Id.*)

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but he found "[her] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 3915–16.)

Considering all the evidence of record, the ALJ determined at Step Four that Plaintiff had no past relevant work. (R. 3930.) At Step Five, however, the ALJ determined that Plaintiff could perform jobs within the national economy, working as a sorter, packer, or bench assembler. (R. 3930–31.) Therefore, the ALJ found that Plaintiff was not disabled. (R. 3931–32.) The ALJ's decision stands as the final decision of the Commissioner for the purpose of judicial review. 42 U.S.C. §§ 405(g), 1383(c)(3).

### E. Medical Opinions at Issue

#### 1. Neha Sakowski, M.D.

Dr. Neha Sakowski, an internal medicine specialist and one of Plaintiff's treating physicians, completed a disability impairment questionnaire on Plaintiff's behalf in May 2025. (R. 4451–45.) The questionnaire is a checkbox and fill-in-the-blank form. (*Id.*) Dr. Sakowski indicated that she first treated Plaintiff in 2021 or 2022 and that she sees Plaintiff every six months. (R. 4451, 4455.) She listed the following as Plaintiff's primary symptoms: "syncope and near syncope, pain (chronic), migraines, chest pain, anxiety/irritability, and concentration deficit." (R. 4453.) Dr. Sakowski also noted that Plaintiff experiences sharp, stabbing, and constant low back pain, and cramps, stabbing pain, and tingling in her knees, back, and shoulders, attributable to fibromyalgia. (*Id.*)

On the questionnaire, Dr. Sakowski indicated that Plaintiff's ongoing impairments were expected to last at least 12 months, and that Plaintiff was not a malingerer. (R. 4451.) She also indicated that in an eight-hour workday, Plaintiff could perform a job in either a seated or standing position for less than one hour. (R. 4452.) She also found it medically necessary for Plaintiff to avoid continuous sitting in an eight-hour workday, and indicated that she should get up from a seated position to move around for one to two minutes, every half hour. (*Id.*) Dr. Sakowski also noted that it was medically necessary for Plaintiff to elevate both legs to chest level or higher while sitting, and as to how often and for what duration elevation was necessary, Dr. Sakowski indicated "when seated." (*Id.*)

In terms of lifting and carrying limitations, Dr. Sakowski noted that Plaintiff could occasionally lift and carry zero to five pounds, but no weights greater than five pounds.

(*Id.*) As for reaching, handling, and fingering, Dr. Sakowski indicated that Plaintiff could not reach over shoulder height with her right arm and has difficulty handling objects when her fingers are swollen. (R. 4454.) She limited Plaintiff to rarely or never using her right arm for reaching, including overhead, and occasionally using her left arm for reaching, and occasionally using both hands to grasp, turn, and twist objections, and using her fingers for fine manipulation. (*Id.*)

In addition, Dr. Sakowski indicated that Plaintiff's anxiety could worsen her symptoms if she were placed in a competitive work environment. (*Id.*) She also found that in an average eight-hour workday, Plaintiff's experience of pain, fatigue, or other symptoms would frequently interfere with her attention and concentration. (*Id.*) In addition, Dr. Sakowski indicated that Plaintiff would need to take unscheduled rest breaks at unpredictable intervals during a workday, as frequently as every 30 minutes. (*Id.*) Dr. Sakowski also found that Plaintiff would likely be absent from work more than three times per month, and she concluded the questionnaire by commenting, "She has significant impairments from several medical issues. I do not see her able to work in any capacity at this time." (R. 4455.)

**2. Jamie Lohr, M.D.**

Plaintiff's treating cardiologist, Dr. Jamie Lohr, completed a cardiac impairment questionnaire in May 2025. (R. 4474–79.) This questionnaire, like the disability impairment questionnaire, is a checkbox and fill-in-the-blank form. (*Id.*) Dr. Lohr noted that she began treating Plaintiff in March 2023 and has seen her twice yearly since that time. (R. 4474.) She indicated that Plaintiff suffers from chest pain, shortness of breath,

fatigue, weakness, palpitations, cough, syncope, near syncope, swelling, and peripheral edema. (R. 4475.) In addition, she noted that Plaintiff experiences infrequent chest pain upon exertion that resolves with rest. (*Id.*)

Dr. Lohr indicated that in an eight-hour workday, Plaintiff could perform a job in a seated position for "6+" hours, and could perform work in a standing position for two hours. (R. 4476.) As for lifting and carrying restrictions, Dr. Lohr found that Plaintiff could frequently lift or carry zero to five pounds, could occasionally lift or carry five to 20 pounds, but could never or rarely lift or carry 20 to 50 pounds or over 50 pounds. (*Id.*)

Dr. Lohr stated that Plaintiff's obesity adds extra strain on Plaintiff's heart. (*Id.*) She also noted Plaintiff's acute cardiac events, corrective cardiac procedures, implanted devices, and medications. (R. 4476–77.) She indicated that Plaintiff's symptoms of significant fatigue, shortness of breath, and syncope would likely increase if she were placed in a competitive work environment. (R. 4477.) Dr. Lohr noted that in an eight-hour workday, Plaintiff's experience of pain, fatigue, or other symptoms would be severe enough to occasionally interfere with attention and concentration. (*Id.*)

Dr. Lohr also indicated that Plaintiff's diagnoses and limitations were expected to last at least 12 months, that she would need to take unscheduled breaks of 20 to 30 minutes to rest at unpredictable intervals during an eight-hour workday, and that she would likely be absent from work two to three times per month. (R. 4478.)

**3. Leah Streitman, PA-C**

Leah Streitman, a certified physician's assistant with whom Plaintiff treated for mental health issues, submitted a mental impairment questionnaire dated April 10, 2025.

(R. 4224–28.) This questionnaire, like the disability impairment and cardiac impairment questionnaires, is a checkbox and fill-in-the-blank form. (*Id.*) PA Streitman noted that Plaintiff began treating with her in October 2022 and she saw the Plaintiff on a monthly basis or based on Plaintiff's preference. (R. 4224.) PA Streitman identified Plaintiff's mental health diagnoses and listed her medications. (*Id.*) She found that Plaintiff's diagnoses and limitations would last at least 12 months, and denied that Plaintiff was a malingerer. (*Id.*) PA Streitman identified the following symptoms: depressed mood; persistent or generalized anxiety; sporadically flat affect; feelings of guilt or worthlessness; hostility or irritability; suicidal ideation in the past; difficulty thinking or concentrating; decreased energy; deeply engrained, maladaptive patterns of behavior; impulsive or damaging behavior; intense and unstable interpersonal relationships; pathological dependence, passivity, or aggressiveness; social withdrawal or isolation; and insomnia due to chronic pain. (R. 4225.)

PA Streitman also indicated that Plaintiff's "chronic pain [and] other medical issues contribute to Plaintiff's mood instability, anxiety, panic, and vice versa." (R. 4226.) She denied that Plaintiff experiences episodes of decompensation or deterioration in a work setting that would cause her to withdraw from the situation or experience an exacerbation of symptoms. (*Id.*)

As to Plaintiff's degrees of limitation in performing mental activities, PA Streitman found "none-to-mild" limitations in Plaintiff's ability to understand and remember one-to-two step instructions, carry out simple one-to-two step instructions, make simple work-related decisions, ask simple questions or request assistance, maintain socially appropriate

behavior, adhere to basic standards of neatness, be aware of hazards and take appropriate precautions, set realistic goals, and make plans independently. (R. 4227.)

She found moderate limitations in Plaintiff's ability to remember locations and work-like procedures, understand and remember detailed instructions, carry out detailed instructions, sustain ordinary routine without supervision, work in coordination with or near others without being distracted by them, perform at a consistent pace without rest periods of unreasonable length or frequency, interact appropriately with the public, get along with coworkers or peers without distracting them, respond appropriately to workplace changes, and travel to unfamiliar places or use public transportation. (*Id.*)

PA Streitman found "moderate-to-marked" limitations in Plaintiff's ability to maintain attention and concentration for extended periods, and accept instructions and respond appropriately to criticism from supervisors. (*Id.*) Finally, she identified as "marked" limitations Plaintiff's ability to perform activities within a schedule and consistently be punctual, and to complete a workday without interruptions from psychological symptoms. (*Id.*)

PA Streitman also noted that Plaintiff experiences other work-related limitations not indicated in the previously identified limitations. She noted that "medical issues are significant, affect her ability to sustain [full-time] work." (R. 4228.)

She indicated that, on average, Plaintiff was likely to be absent from work as a result of her impairments more than three times per month. (*Id.*)

## II. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g), or whether the ALJ's decision resulted from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or because the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

It is a claimant's burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). To meet the definition of disability for SSI, the claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 42 U.S.C. § 1382c(a)(3)(A). As to the durational

requirement, the disability, not just the impairment, must have lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

## III. Discussion

Plaintiff presents two arguments in support of remand or reversal. (Pl.'s Br. at 25–38.) First, she argues that the ALJ failed to properly evaluate the medical opinion evidence of three of her treating providers, resulting in an RFC that was not based on substantial evidence. (*Id.* at 25–34.) Second, she contends that the ALJ failed to properly evaluate her subjective symptom testimony. (*Id.* at 34–38.)

### A. Treating Physicians

The ALJ found the opinions of Dr. Sakowksi and P.A. Streitman unpersuasive, and the opinion of Dr. Lohr only partially persuasive. (R. 3926–27, 3929–30.) Plaintiff alleges that the ALJ failed to properly consider the consistency and supportability factors of 20 C.F.R. §§ 404.1520c in assessing the persuasiveness of the three providers' opinions, resulting in an inaccurate determination of her RFC. (Pl.'s Br. at 26.) Under the revised Social Security regulations, a treating source's opinion is entitled to no deference, and is subject to the same analysis of persuasiveness as other medical opinions. *Cropper v. Dudek*, 136 F.4th 809, 814 (8th Cir. 2025).

Consistency and supportability are two of five factors used when considering and articulating the persuasiveness of medical opinions, and they are the most important. 20 C.F.R. §§ 404.1520c(c)(1)–(2), 416.920c(b)(2), 416.920c(c)(1)–(2). In evaluating consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the

claim, the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The regulatory language pertaining to supportability provides that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

Where the ALJ has evaluated both the consistency and supportability of a medical opinion, the reviewing court's role is not "to reweigh the evidence of record regarding the supportability and consistence factors," but rather, to "uphold the ALJ's findings that the medical opinions are not persuasive unless that finding falls outside the available zone of choice." *Cropper*, 136 F.4th at 814 (8th Cir. 2025) (citation omitted). The zone of choice is a legal principle that provides the ALJ latitude to weigh evidence and reach a reasonable conclusion, without interference from the courts, as long as substantial evidence supports the ALJ's conclusion. *See Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021). The Eighth Circuit does not require that the ALJ "explicitly . . . reconcile every conflicting shred of medical evidence," and the ALJ "is free to accept some, but not all, of a medical opinion." *Austin v. Kijakazi*, 52 F.4th 723, 729 (8th Cir. 2022) (quotations and citations omitted). The question of "[w]hether the ALJ should have provided *additional* limitations amounts to a disagreement over the weighing of evidence within the record," which is outside the scope of judicial review. *Id.* at 731 (emphasis in original).

**1. Dr. Sakowski**

As noted earlier, Dr. Sakowski completed a checkbox, fill-in-the-blank form indicating that Plaintiff could sit for less than one hour in an eight-hour day, stand and/or walk for less than one hour in an eight-hour workday, would need to change positions every half hour, elevate both legs to chest level or higher, lift and carry no more than five pounds, would need frequent unscheduled breaks, and would be absent from work more than three times per month. (R. 4452–55.)

The ALJ found that Dr. Sakowski's opinion lacked supportability because she provided "only very general internal support for the extreme limitations." (R. 3926.) The Eighth Circuit has held that "[w]hen a treating physician's opinion appears on [a checkbox] form, an ALJ permissibly may rely more heavily on other opinions in the record." *Swarthout v. Kijakazi*, 35 F. 4th 608, 611 (8th Cir. 2022). Such forms typically provide "little to no elaboration" and provide "vague, conclusory statements." *Id.* (citing *Thomas v. Berryhill*, 881 F.3d 672 (8th Cir. 2018)); *see also Nolen v. Kijakazi*, 61 F.4th 575, 577 (8th Cir. 2023) ("The opinion's bare, formulaic conclusion presumptively warranted little evidentiary weight because it was rendered on a check-box and fill-in-the-blank form.") (citations and quotations omitted). While the disability impairment questionnaire that Dr. Sakowski completed had some blank spaces to add information, the majority of her opinions were in response to checkboxes. (*See* R. 4451–55.)

While Plaintiff argues that Dr. Sakowski's opinion was supported by portions of the record, including a list of Plaintiff's prescriptions, diagnoses, and a one-time assessment by an occupational therapist (Pl.'s Br. at 26) (citing R. 4456–66), the ALJ discussed the

occupational therapist's findings earlier in his opinion. (R. 3921) (noting that "[t]he results indicated mild cognitive impairment, independence with lower body dressing, independence with basic kitchen skills, . . . some upper extremity deconditioning," and that plaintiff "was appropriate for discharge and no further occupational therapy was indicated from the evaluation."). The ALJ also explained that Plaintiff had minimal visits with Dr. Sakowski. (R. 3926–27.) He noted that while Plaintiff made subjective complaints to Dr. Sakowski, the doctor's objective observations showed that Plaintiff was in no distress and was cooperative. (R. 3927.) The ALJ also observed that during a subsequent appointment with Dr. Sakowski, Plaintiff showed no apparent abnormalities, and the record showed little, to no other, follow-up appointments with Dr. Sakowski. (*Id.*) The Court finds that the ALJ sufficiently considered and addressed the supportability factor when evaluating the persuasiveness of Dr. Sakowski's opinions.

As to the consistency of Dr. Sakowski's opinion with the record as a whole, the ALJ adequately explained why he found her opinion inconsistent. (*Id.*) He noted that while Plaintiff was born with a congenital heart condition and had experienced a myocardial infarction in 2020, her ejection fraction had improved at follow-up visits. (*Id.*) In addition, the ALJ pointed to records from 2024 showing that Plaintiff was able to walk from 10 minutes to an hour. (*Id.*) He also noted that in a February 28, 2025 visit with Dr. Lohr, the record reflected that Plaintiff's echocardiogram "looked very stable and documented normal findings." (*Id.*) As to Plaintiff's other impairments, including headaches, dizziness, and vertigo, the ALJ identified records reflecting that Plaintiff engaged in physical therapy, exercise, and reported occasional improvement. (*Id.*) With respect to

her asthma, the ALJ cited records showing that Plaintiff uses an inhaler a few times a week and needs oral steroids once a year. (*Id.*) As to her right shoulder impairment, the ALJ noted records showing Plaintiff participated in strengthening exercises and physical therapy. (*Id.*) In sum, he acknowledged that the record demonstrates that Plaintiff experiences a number of limitations, but found them not disabling. (*Id.*)

Thus, the Court finds that the ALJ did not improperly evaluate the persuasiveness of Dr. Sakowski's opinions and evidence in the record. He considered evidence that supported her opinions, as well as contradictory evidence, and he offered an adequate explanation concerning supportability and consistency. Substantial evidence supports his conclusions. As such, the ALJ did not err in the RFC determination that flowed, in part, from his evaluation of Dr. Sakowski's opinions. Even if this Court would reach a different conclusion, or if substantial evidence supports a contrary outcome, the Court does not reverse the Commissioner's conclusions as long as they are supported by substantial evidence on the record as a whole. *Nash*, 907 F.3d at 1089.

**2. Dr. Lohr**

Dr. Lohr also completed a checkbox, fill-in-the-blank form indicating that Plaintiff could sit for six or more hours in an eight-hour workday, stand and/or walk for two hours in an eight-hour workday, and could occasionally lift and/or carry up to twenty pounds, and frequently lift and/or carry up to five pounds. (R. 4474–79.) The ALJ found this portion of Dr. Lohr's opinion persuasive, concluding it was generally supported by Dr. Lohr's treatment notes, and was consistent with the medical record addressed earlier in the

ALJ's decision. (R. 3927–28.) Based on her opinion and other medical evidence, the ALJ found that a range of sedentary work was appropriate. (*Id.*)

However, the ALJ found unpersuasive the portion of Dr. Lohr's opinion in which she determined that Plaintiff's pain, fatigue, or other symptoms would occasionally interfere with her attention and concentration, that she would need to take 20 to 30-minute breaks at unpredictable intervals, and that she would be absent from work two to three times per month due to her conditions. (R. 3927) (citing R. 4477–78). He found that this opinion was not entirely supported by Dr. Lohr's treatment notes, stating,

> While the claimant reported different issues to Dr. Lohr, objective examinations, which have been described above, have consistently been apparently normal. And, also as already noted, in one of the most recent visits with Dr. Lohr, dated February 28, 2025, she indicated the claimant's echocardiogram looked very stable and documented normal findings.

(R. 3928.) In addition, the ALJ found that this portion of Dr. Lohr's opinion was not consistent with the overall record, for many of the reasons identified with regard to Dr. Sakowski's opinion. (*Id.*)

Again, when a treating physician's opinion appears on a checkbox form, an ALJ may rely more heavily on other opinions in the record. *Swarthout*, 35 F. 4th at 611. As with Dr. Sakowski's questionnaire, Dr. Lohr's opinions found on the cardiac impairment questionnaire are largely checkbox responses. (R. 4474–79.) Plaintiff accuses the ALJ of cherry-picking evidence in the medical record to support the RFC, but the Court disagrees. (Pl.'s Br. at 27.)

The ALJ identified substantial evidence to support his findings. Plaintiff contends that the ALJ ignored decreasing blood pressure values from January 2021 when Plaintiff

moved from supine to sitting and from sitting to standing, as well as a finding in December 2021 that Plaintiff had a functional capacity of only 4 METs. (Pl.'s Br. at 28.) But the ALJ addressed Plaintiff's cardiology treatment in 2021, noting that in April, her ejection fraction had improved to 45 to 50%, and while she sometimes felt dizzy and lightheaded, she was walking daily. (R. 3917.) The ALJ also noted that Plaintiff's November 2021 echocardiogram showed normal LV function with stable regional wall motion abnormalities. (*Id.*) Her mechanical aortic valve was functioning properly, and while there was evidence of mild mitral stenosis consistent with rheumatic mitral valve, and she had moderate pulmonary hypertension, Plaintiff's ejection fraction was at 55% and she was walking three blocks a day for exercise. (*Id.*) The ALJ also cited Dr. Lohr's treatment notes showing that while Plaintiff "reported issues with exertion and changing positions," "physical examinations revealed a number of normal findings including no issues with breathing, normal heart sounds, and no edema, and no issues with extremities." (*Id.*) In addition, the ALJ noted that on Plaintiff's February 2025 visit with Dr. Lohr, Plaintiff's echocardiogram looked very stable and documented normal findings. (*Id.*) The Court finds that the ALJ's opinion regarding the supportability of a portion of Dr. Lohr's opinion is adequately supported by the record.

As to consistency, Plaintiff points to evidence in the record in support of her argument that Dr. Lohr's opinion was consistent with the record. (Pl.'s Br. at 28–29.) However, the ALJ chronicled Plaintiff's medical history in detail, as noted above in the Court's discussion of the ALJ's assessment of Dr. Sakowski's opinion. (R. 3916–30.)

The Court finds that the ALJ adequately explained why he found a portion of Dr. Lohr's opinion was not entirely supported by her treatment notes and not consistent with the overall record. Accordingly, the ALJ did not err in the RFC determination that flowed, in part, from his evaluation of Dr. Lohr's opinions.

**3. PA Leah Streitman**

PA Leah Streitman also completed a checkbox, fill-in-the-blank form indicating that Plaintiff's mental impairments caused marked limitations in performing activities within a schedule and consistently being punctual, completing a workday without interruptions from psychological symptoms, and absences from work more than three times per month. (R. 4224–28.)

Plaintiff argues that the ALJ failed to sufficiently explain why he found PA Streitman's opinion unpersuasive, and points to treatment notes in the record in which Streitman documented Plaintiff's "continued depressive symptoms including suicidal ideation, self-injury, [] difficulty performing hygiene, as well as racing thoughts, sleep disturbances, fatigue, [and] anxiety." (Pl.'s Br. at 31) (citations omitted). Plaintiff also contends that PA Streitman's records document Plaintiff's difficulties in managing and coping with her medical issues. (*Id.*) (citations omitted).

In finding PA Streitman's limitations unpersuasive, the ALJ explained that they were "not entirely supported" by her own progress notes, as those notes indicated that Plaintiff "was doing okay and medications were effective." (R. 3930.) The ALJ acknowledged that the "objective observations showed some abnormalities such as anxious and labile mood but also many normal findings such as unimpaired memory, normal

thought, and normal grooming." (*Id.*) He had addressed the progress notes in detail, earlier in his opinion. (R. 3923–25.)

The ALJ also noted that PA Streitman's opinion was not consistent with the overall record, as "[Plaintiff's] mental status examination findings at other appointments and the consultative examination were generally normal." (R. 3930.) He discussed, in detail, the longitudinal evidence concerning Plaintiff's mental conditions, along with her pre-2015 history of psychiatric hospitalizations. (R. 3921–25.) Mental status examination at an August 2021 psychological consultative examination showed grossly appropriate affect, concentration and attention within normal limits, ability to remain on-task throughout the examination, well developed abstraction, and grossly appropriate judgment. (R. 3922–23) (citing R. 1557–58). The ALJ also referenced progress notes that showed unremarkable findings. (*Id.*) (citing R. 3720, 3747, 3751–52).

While Plaintiff cites some portions of the record that detract from the ALJ's determination (Pl.'s Br. at 26–33), that is an insufficient basis for reversing the ALJ's decision. *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) ("While it is not surprising that, in an administrative record which exceeds 1,500 pages, [the claimant] can point to some evidence which detracts from the Commissioner's determination, good reasons and substantial evidence on the record as a whole support the Commissioner's RFC determination and the decision to discount [a treating physician's] opinion.").

Thus, the Court finds that the ALJ did not improperly evaluate the persuasiveness of PA Streitman's opinions and evidence in the record. He considered evidence that supported her opinion, as well as evidence that contradicted it, and he offered an adequate

explanation concerning supportability and consistency. Substantial evidence supports his conclusions.

In sum, the ALJ sufficiently explained that the opinions of Dr. Sakowski and PA Streitman, and a portion of Dr. Lohr's opinion, were not persuasive based on his evaluation of supportability and consistency, as required by 20 C.F.R. § 404.1520c. Because his opinion falls within the zone of choice, even if substantial evidence supports "two inconsistent conclusions," the Court will not reverse the ALJ's decision on this basis. *Cropper*, 136 F. 4th at 815.

### B. ALJ's Evaluation of Plaintiff's Subjective Symptom Testimony

Plaintiff also argues that the ALJ failed to properly evaluate her subjective symptom testimony and improperly discounted her credibility. (Pl.'s Br. at 34–38.) She contends that aside from a summary of the medical evidence and a discussion of the medical opinions, the ALJ failed to provide specific reasons for finding Plaintiff not credible regarding the extent of her symptoms and limitations. (*Id.* at 35) (citing R. at 3916–30.) In particular, she asserts that the ALJ failed to sufficiently consider the combination of her impairments when assessing her credibility. (*Id.*) In response, Defendant argues that Plaintiff's recitation of supporting evidence constitutes an improper request for reweighing of the evidence, not an identification of reversible error. (Def.'s Br. at 10–11.)

In analyzing a claimant's subjective complaints, such as pain, an ALJ must consider the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984): (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3)

dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001). Other factors also include the claimant's "relevant work history and the absence of objective medical evidence to support the complaints." *Id.* (quotation omitted).

While ALJs must acknowledge and consider the *Polaski* factors before discounting a claimant's subjective complaints, the Eighth Circuit has held that ALJs "need not explicitly discuss each *Polaski* factor." *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) (quotation omitted). ALJs may discount claimants' complaints if there are inconsistencies in the record as a whole, and the ALJ gives good reasons for doing so. *Wildman v. Astrue*, 596 F.3d 959, 968–69 (8th Cir. 2010).

Plaintiff correctly notes that her complex medical history has required treatment from multiple specialists in cardiology, hematology, gynecology, psychiatry, pain management, rheumatology, pulmonology, neurology, physical medicine and rehabilitation, and physical therapy. (Pl.'s Br. at 35.) Often, treatment for one condition has been contraindicated due to another condition or medication for another condition. (*Id.*) For example, when Plaintiff was evaluated for acute blood loss anemia, her OB/GYN advised her to undergo a hysterectomy, but her cardiologist recommended conservative management until she had reached the one-year anniversary of her heart attack. (R. 703–04, 712.) Plaintiff chose to undergo the hysterectomy despite the risk because she could no longer tolerate her symptoms. (R. 660.) The record shows that Plaintiff's treatments for pain are also limited because of her cardiac history and need for lifelong

anticoagulation medication. (R. 65, 469.) Due to her history of suicide, it was recommended that she forego opioid therapy for pain management. (R. 4336.)

Plaintiff provided ample testimony regarding the consistency, persistence, and functionally limiting effects of her symptoms, based largely on the combined effects of numerous medical conditions. At the February 2, 2023 hearing, she testified that her tolerance for walking, in terms of duration or distance, depends on her pain level, breathing issues, or physical reaction to walking. (R. 57.) She emphasized that she is "tippy" when standing still for longer than five or ten minutes, and that if she stands while doing dishes, she is limited to "five minutes, max" and that her "lower back is just done for." (R. 58.) She also testified to experiencing chest pain when engaging in activities and "sometimes when I'm not even doing anything." (R. 64.) However, Plaintiff testified that her syncope episodes preclude her from taking "nitro[glycerin] as much." (*Id.*) Plaintiff was advised against driving because she was at risk for syncope behind the wheel, and she testified in May 2025 that she no longer drove a car. (R. 3947.) She testified that her syncope episodes often occur randomly: "I could be sitting. I could be walking. I could be going to the bathroom. I could be eating. It doesn't matter what I'm doing. And I could just pass out straight onto the floor." (R. 55–56.) Her medical conditions also affected her ability to attend therapy on a consistent basis. (R. 2375, 2452, 2503, 2544, 2582, 2623, 2681, 2710, 2821, 2827, 3720.)

At the May 1, 2025 hearing, Plaintiff testified that a number of medical issues combine to prevent her from working, including syncope, pain, anxiety, and numerous medications. (R. 3949, 3951.) She stated that she frequently loses consciousness during

syncope episodes, some of which "happen[] out of nowhere." (R. 3950.) She noted that her heart condition leads to swelling in her extremities, which requires her to elevate her feet any time that she is seated. (R. 3955.) As to her anxiety, Plaintiff testified that "everything" triggers it, and her "mind is constantly thinking about one thing or another. [M]y brain is constantly going and it never stops." (R. 3953.)

Despite Plaintiff's testimony regarding the consistency, persistence, and functionally limiting effects of her symptoms, the ALJ's decision contains no substantive discussion reflecting his consideration of her subjective statements about her symptoms. After he summarized Plaintiff's subjective statements, including her testimony, the ALJ made the following determination:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(R. 3916.)

The ALJ merely provided a summary of objective medical evidence and a boilerplate conclusory statement. The lack of objective evidence is only one factor to consider when evaluating credibility, and Plaintiff's medical records show a significant history of complex medical conditions and treatments. *See Todd-Smith v. Astrue*, 508 F. App'x 592 (8th Cir. 2013) (noting that lack of objective evidence was only one factor in evaluating credibility, and plaintiff's medical records "show[ed] a long history of back surgeries, epidural steroid injections, and significant pain medication."). The Court agrees

with Plaintiff that the ALJ did not adequately address the impact of Plaintiff's psychological conditions on her perceptions of pain, syncope, dizziness, or fatigue, nor did he consider the impact of her physical symptoms on her psychological state, nor did he adequately address the impact of certain physical conditions on other physical conditions. *See Delrosa v. Sullivan*, 922 F.2d 480, 485–86 (8th Cir. 1991) (directing, on remand, consideration of "the aggravating factor posed by the possibility that [plaintiff's] perception of pain is exacerbated by his psychological impairment."). While Defendant points to daily activities and the effectiveness of Plaintiff's medication (Def.'s Br. at 11), the ALJ fails to explain how those activities are inconsistent with Plaintiff's alleged limitations. Again, the ALJ need not explicitly discuss each *Polaski* factor individually, but it must be evident from the record that the ALJ considered them. *Tiffany E. v. Kijakazi*, No. 22-cv-1011 (DJF), 2023 WL 5830391, at *6 (D. Minn. Sept. 8, 2023). Nor did the ALJ address whether Plaintiff's combined medical impairments—including the frequency and unpredictability of her flare-ups and need for care—would lead to a level of absenteeism incompatible with competitive employment. The Court agrees with Plaintiff that because the ALJ failed to "build a logical bridge between the evidence and the conclusion," (Pl.'s Reply at 6), the decision is not supported by substantial evidence.

Thus, to the extent that Plaintiff seeks an Order remanding this matter to the Social Security Administration for further administrative proceedings consistent with this Order, Plaintiff's request is granted. However, to the extent Plaintiff seeks an Order of this Court reversing the Commissioner's final decision and remanding this proceeding to the Social Security Administration for an immediate award of benefits, Plaintiff's request is denied.

## IV. Order

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. The relief sought in Plaintiff's Brief [Doc. No. 10], seeking remand or reversal of the Commissioner's decision to deny her Social Security disability benefits, is **GRANTED in part**, and **DENIED in part**, as set forth above;
2. The relief sought in Defendant Commissioner of Social Security Administration Frank Bisignano's Brief in Opposition [Doc. No. 13], requesting that the Court affirm the Commissioner's decision, is **DENIED**; and
3. The above captioned matter is **REMANDED** to the Social Security Administration, pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: September 2, 2026

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge